IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
JONESBORO DIVISION

BILLY JAMES MURPHREE                                                      PLAINTIFF

v.                                  NO. 3:17-cv-00165 PSH

NANCY A. BERRYHILL, Acting Commissioner                                  DEFENDANT
of the Social Security Administration

## MEMORANDUM OPINION AND ORDER

Plaintiff Billy James Murphree ("Murphree") began this case by filing a complaint pursuant to 42 U.S.C. 405(g). In the complaint, he challenged the final decision of the Acting Commissioner of the Social Security Administration ("Commissioner"), a decision based upon the findings of an Administrative Law Judge ("ALJ").

Murphree maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole and offers two reasons why.[1] Murphree first maintains that his foot pain is a severe impairment, and the ALJ erred at step two of the sequential evaluation process when he failed to so find. Second, Murphree maintains that his residual functional capacity was erroneously assessed. He so maintains because there is no opinion from a treating or examining physician addressing his residual functional capacity and because his hypertension, daily activities, and work history were not given adequate consideration.

---

[1] The question for the Court is whether the ALJ's findings are supported by substantial evidence on the record as a whole. "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." See Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011).

The record reflects that Murphree filed an application for disability insurance benefits on November 13, 2014, and alleged that he became disabled and unable to work beginning on July 26, 2011. With respect to the relevant period in this case, the Commissioner represents the following:

> While [Murphree] alleges an earlier onset date of June 26, 2011, there is a prior ALJ decision dated February 15, 2013, for which the Appeals Council denied remand on December 4, 2013 (Tr. 66-86). The February 15, 2013, decision was not appealed to the District Court. Accordingly, the relevant period for this matter [began on] February 16, 2013. See Blado v. Apfel, 205 F.3d 356 (8th Cir. 2000). Moreover, [Murphree] did not request a reopening of his prior decision, nor was one granted by the ALJ in this previous matter.

See Docket Entry 12 at CM/ECF 1, n.1.

The record supports the Commissioner's assertions with respect to the relevant period in this case. The period began on February 16, 2013, i.e., the day after the prior ALJ's decision. The question for review is whether Murphree was disabled for purposes of the Social Security Act at any time from February 16, 2013, through June 9, 2016, i.e., the day of the most recent unfavorable ALJ decision. The Court will consider evidence prior to February 16, 2013, in reviewing the most recent unfavorable ALJ decision but will do so only to provide an historical foundation or context.

Murphree was born on February 7, 1951. He was sixty years old on the day he allegedly became disabled and was sixty-five years old on the day of the administrative hearing. He alleged in his application for disability insurance benefits that he is disabled and unable to work because of impairments in the form of diabetes mellitus ("diabetes"), hypertension, and foot pain.

Murphree has ably summarized the evidence in the record, and the Commissioner has not challenged the summary. It will not be reproduced, save to note several matters germane to the issues raised in the parties' briefs.

The record reflects that Murphree was diagnosed with diabetes in 1990, 1995, "or something like that." See Transcript at 36. When Murphree presented to Dr. Andrew Jansen, M.D., ("Jansen") on August 24, 2011, Murphree reported not having seen a physician for his diabetes in two to three years. A physical examination produced unremarkable results. Jansen diagnosed diabetes, controlled; hypertension; and tobacco use. He prescribed Metformin for diabetes and enalapril for hypertension.

Murphree thereafter saw Jansen on what appears to have been six occasions. See Transcript at 580-581 (12/07/2011), 576-577 (01/31/2012), 573-574 (03/13/2012), 570-571 (05/23/2012), 559-560 (07/31/2012), 554-556 (04/08/2012). Murphree was seen primarily for medication re-checks, although Jansen eventually began treating Murphree for hyperlipidemia. Murphree reported no significant problems associated with his diabetes, hypertension, or hyperlipidemia. He generally reported feeling well and being capable of exercise. Jansen continued Murphree on medication.

On July 18, 2012, Murphree saw Dr. Danny Holt, M.D., ("Holt") for burns Murphree sustained to his feet while fighting a brush fire. See Transcript at 568-569. Holt examined Murphree's feet and recorded the following observations: "All but the 5th toe of the left foot exhibit burns with loss of superficial skin layer. The great toe, second toe, and the third toe of the right foot exhibit similar burns. There is a drying vessicle on the medial aspect of the right great toe." See Transcript at 568. Holt cleaned Murphree's wounds and gave him instructions for caring for his wounds.

Murphree thereafter sought medical attention for the wounds to his feet on several occasions. See Transcript at 565-566 (07/20/2012), 563-564 (07/23/2012), 547-550 (07/27/2012), 561-562 (07/27/2012), 540-545 (07/30/2012). He reported during the period that his wounds improved and his pain subsided. Although he declined admission to a burn center, he eventually began undergoing outpatient treatment at a wound center. See Transcript at 283-539. Murphree summarized the progress notes from the outpatient treatment as follows: "… was discharged on November 19, 2012. … At that time, [Murphree] was having intermittent pain, with a severity of 3 at times. He used Aleve and elevation to relieve his pain. Dr. [Brad] Fields, [M.D.] wrote that the wounds had resolved." See Docket Entry 11 at CM/ECF 10-11. Notwithstanding the wounds "resolving," Murphree continued to experience occasional pain and tingling in his feet. See Transcript at 678 (05/08/2014), 735 (01/26/2016).

Beginning on May 2, 2013, and continuing through January 26, 2016, Murphree was seen at a Veterans Affairs ("VA") medical center for complaints primarily associated with diabetes and hypertension. See Transcript at 683-691 (05/02/2013), 671-680 (05/08/2014), 664-665 (10/14/2014), 657-664 (12/18/2014), 650-655 (01/20/2015), 643-650 (02/12/2015), 636-643 (03/12/2015), 714-721 (04/21/2015), 729-738 (01/26/2016). When Murphree presented on May 2, 2013, Dr. Gordon Akin, M.D., ("Akin") noted that Murphree had been laid off for about a year and had not worked. Murphree's medications included Metformin, Metoprolol, glimepiride, Januvia, and Azor. A physical examination produced unremarkable results. Akin assessed diabetes with some neuropathy; hypertension, not optimally controlled; and a history of second degree burns of the feet with "fortunate outcome." See Transcript at 683.

4

On May 7, 2014, Akin wrote Murphree to provide the results of testing that had been performed five days earlier. In the letter, Akin represented the following: "… The laboratory testing revealed normal kidney function … and just a slightly elevated bad cholesterol (LDL). … The hemoglobin A1C indicated suboptimal control of the diabetes over the past several months. [Try] your best to limit the carbohydrate intake and stay as active as possible. …" See Transcript at 682-683.

On May 8, 2014, Murphree saw Dr. George Patton, M.D., ("Patton") at a VA medical center. See Transcript at 671- 80. A physical examination produced unremarkable results. Patton observed that Murphree appeared "younger than his chronological age" and could ambulate without difficulty. See Transcript at 672. His blood pressure, though, was elevated. Testing was performed, and Patton notified Murphree of the results the following day. In a letter, Patton represented the following:

> Your tests revealed that your diabetes is uncontrolled with a hemoglobin A1C … of 9.0%, elevated triglycerides of 597, elevated cholesterol of 232, and low Vitamin D of 14.6. Your kidneys are working fine so you may continue your metformin. I am initiating several changes in an attempt to address the above mentioned problems. Your diabetes is not going to be controlled on oral medications. At this point, you will need both a long acting insulin that is taken at night and a short acting insulin to take with meals. … The first change is to discontinue sitagliptin as it has only a minimal impact on your blood sugar levels. The next medication to stop is your glipizide. … I will order another medication for diabetes called pioglitazone. … To better control your cholesterol and triglycerides, I am changing your medication from pravastatin to atorvastatin as the atorvastatin is more effective. … I will order Vitamin D 2000IU tabs to be taken one daily. …

See Transcript at 608. Because Murphree's hypertension proved difficult to control, Patton started Murphree on chlorthalidone, started a trial of spironolactone, and ordered diabetic shoes, test strips, and a new glucometer. See Transcript at 666, 668.

5

On October 14, 2014, Murphree was seen for his diabetes by a VA nurse. See Transcript at 664-665. The progress note is significant because Murphree reported that he was not taking his insulin. He did not believe that it was necessary because of the benefits he obtained from diet and exercise.

Murphree saw Patton again on December 18, 2014. See Transcript at 657-664. Murphree reported feeling fine, although his blood pressure was high. Patton continued to diagnose, inter alia, diabetes, hypertension, and hyperlipidemia. Testing was performed and revealed that Murphree's A1C was down to 6.4 percent and need not be improved. Patton was of the opinion, though, that Murphree's cholesterol values and Vitamin D levels required correction. Patton recommended a low-salt diet and prescribed medication to address the problems.

Murphree continued seeing Patton intermittently in 2015 and on into 2016 for complaints primarily associated with diabetes and hypertension. See Transcript at 643-650 (02/12/2015), 636-643 (03/12/2015), 714-721 (04/21/2015), 729-738 (01/17/2016). When Murphree presented on March 12, 2015, his hypertension was "still not to goal." See Transcript at 636. He reported no other complaints, though. A physical examination revealed, in part, that he appeared "younger than chronological age" and could ambulate normally. See Transcript at 636. Patton diagnosed "[d]ifficult to control hypertension" and adjusted Murphree's medication.

Murphree saw Patton on April 21, 2015, and Murphree reported that verapamil was helping control his hypertension. Patton observed that Murphree's blood pressure was "slowing coming down to the target." See Transcript at 714. Murphree reported no other complaints, and his medication was adjusted.

Murphree saw Patton again on January 26, 2016, for an evaluation of Murphree's diabetes and hypertension. Murphree reported no acute complaints, and a physical examination revealed, in part, that he appeared "younger than chronological age" and could ambulate normally. See Transcript at 729. Testing was performed and revealed that Murphree's diabetes was under control. His blood pressure, though, was not under control, and Patton recommended additional steps in an attempt to control it.

Murphree completed a series of documents in connection with his application. See Transcript at 207-214, 215-216, 217-224, 225-232. In the documents, he represented that he tires easily, his feet hurt all the time, and he cannot stand for very long. He can attend to his personal care, prepare simple meals, perform some household and yard work, and engage in social activities. He estimated that he can walk for about fifty feet before requiring rest and must rest for about fifteen minutes before he can begin walking again.

Murphree testified during the administrative hearing. See Transcript at 32-57. He lives with his father and has done so for about twenty to twenty-five years. Murphree helps care for his father, but Murphree's ability to do so is limited. Murphree has a twelfth grade education. He last worked "five, three, four years" earlier and retired at age sixty-two from a job as a hand packager. See Transcript at 33. He previously worked as a bar manager for the American Legion. His feet appear "deformed," see Transcript at 49, but he has not sought treatment for his feet since 2012 and is not taking any medication for his problems. His diabetes has been controlled at times. When it is not, he experiences dizziness and weakness and must sit down. He can stand for about forty-five minutes before he begins to experience numbness in his feet.

Murphree's medical records were reviewed by state agency medical professionals. See Transcript at 88-98, 100-109. The medical professionals agreed that Murphree's impairments, impairments they identified as diabetes and hypertension, are not severe and do not significantly limit his physical ability to do basic work activities.

The ALJ found at step two that Murphree has severe impairments in the form of diabetes and hypertension. With respect to Murphree's foot pain, the ALJ found the following:

> ... The record shows that [Murphree] suffered damage to his feet in 2012 after putting out a fire and having subsequent burns. He testified that he could not feel that his feet were burning and was wearing boots. He lost some toenails and had to undergo wound debridement and treatment for several months ... Since that time, [he] has not been treated for any problems with his feet. He reports that he has problems standing and has pain, but there are no treatment records for foot pain since 2012. While [he] may experience some degree of foot pain, his status-post foot wounds have not been addressed in any recent medical records. As such, his status-post foot wounds are considered non-severe impairments as there is nothing in the record that suggests that his foot pain would significantly limit his ability to perform basic work-like tasks.

See Transcript at 19-20. The ALJ assessed Murphree's residual functional capacity and found that he is capable of performing the full range of medium work. The ALJ made the assessment primarily on the basis of Murphree's "treatment history, the activities of daily living, and the opinion evidence," although the ALJ only gave "some weight" to the opinions of the state agency medical professionals. See Transcript at 22. The ALJ gave some consideration to Murphree's "prior work history and the observations of non-medical third parties." See Transcript at 21. The ALJ found at step four that Murphree can return to his past relevant work as a hand packager and bar manager and was therefore not disabled for purposes of the Social Security Act.

Murphree maintains that the ALJ's findings are not supported by substantial evidence on the record as a whole. Murphree first maintains that his foot pain is a severe impairment, and the ALJ erred at step two when he failed to so find. Murphree so maintains because he continues to experience pain and tingling in his feet.

At step two, the ALJ is obligated to identify the claimant's impairments and determine if they are severe. An impairment is severe if it has "more than a minimal effect on the claimant's ability to work." See Henderson v. Sullivan, 930 F.2d 19, 21 (8th Cir. 1992) [internal quotations omitted].

Substantial evidence on the record as a whole supports the ALJ's finding that Murphree's foot pain is not a severe impairment. The Court so finds for three reasons. First, the determination at step two is a medical determination, see Bowen v. Yuckert, 482 U.S. 137 (1987), and there is no medical evidence that Murphree's foot pain has more than a minimal effect on his ability to work. Although there is evidence he experiences pain and tingling in his feet, the evidence consists solely of his self-reports. As the ALJ could and did find, Murphree underwent treatment for the wounds to his feet in 2012, and there are no treatment records for foot pain since then. The last treatment record, dated November 19, 2012, reflects that his wounds were resolved.

Second, to the extent Murphree's self-reports of foot pain are medical evidence substantiating a severe impairment, the reports are not particularly compelling. He represents, and the Court accepts, that he complained of foot pain in May of 2014 and January of 2016. See Docket Entry 11 at CM/ECF 21. Thus, he made only two reports of foot pain in four years. It does not appear that he received any treatment for his complaints, and he was repeatedly observed to ambulate without difficulty.

Third, the ALJ's failure to identify Murphree's foot pain as a severe impairment at step two is ultimately of no legal significance. Once the ALJ proceeds past step two, as he did here, the labeling of an impairment as "severe" or "non-severe" has no legal significance because the ALJ must consider the claimant's severe and non-severe impairments in crafting the residual functional capacity. See 20 C.F.R. 416.945(e).

Murphree offers a second reason why the ALJ's findings are not supported by substantial evidence on the record as a whole. Murphree maintains that his residual functional capacity was erroneously assessed, and he offers several reasons why.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most a person can do despite his limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record, but the assessment must be supported by some medical evidence. See Wildman v. Astrue, 596 F.3d 959 (8th Cir. 2010). In the assessment, the ALJ must evaluate the claimant's subjective complaints. See Pearsall v. Massanari, 274 F.3d 1211 (8th Cir. 2001). The ALJ should consider the medical evidence and evidence of the claimant's daily activities; the duration, frequency, and intensity of his pain; the dosage and effectiveness of his medication; precipitating and aggravating factors; and functional restrictions. See Id. [citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984)].

Murphree first maintains that the record was not adequately developed because there is no opinion from a treating or examining physician. It is Murphree's contention that the ALJ should have obtained an opinion from Murphree's treating physician or, alternatively, ordered a consultative examination, rather than rely solely upon the opinions of non-examining physicians and his own inferences.

The Court is satisfied that the ALJ adequately developed the record, and there is sufficient information for him to have made an informed decision.[2] It is true that there is no opinion addressing Murphree's ability to perform work-related activities, and while such an opinion would have been helpful, one was not required. See Hensley v. Colvin, 829 F.3d 926 (8th Cir. 2016).[3] The ALJ could and did rely, in large part, upon the medical records prepared by Murphree's treating physicians. The ALJ did not rely solely upon their medical records, though. The ALJ also relied, to a lesser degree, upon Murphree's subjective representations and the opinions offered by the state agency medical professionals, and the ALJ could make the assessment he did.

Murphree faults the ALJ for relying too heavily upon the opinions of the state agency medical professionals. The Court cannot agree. The record reflects that their opinions were but one of the factors the ALJ relied upon in assessing Murphree's residual functional capacity. Moreover, the ALJ only afforded the opinions "some weight," which was a reasonable weighing of the opinions.

---

[2] The ALJ has an obligation to fully develop the record. See Battles v. Shalala, 36 F.3d 43 (8th Cir. 1994). There is no bright line test for determining whether the ALJ fully developed the record; the determination is made on a case by case basis. See Id. It involves examining whether the record contains sufficient information for the ALJ to have made an informed decision. See Pratt v. Asture, 372 Fed.Appx. 681 (8th Cir. 2010).

[3] In Hensley v. Colvin, the Court of Appeals observed the following:

... "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." Cox, 495 F.3d at 619. However, there is no requirement that an [residual functional capacity] finding be supported by a specific medical opinion. See Myers, 721 F.3d at 526-27 (affirming RFC without medical opinion); Perks v. Astrue, 687 F.3d 1086, 1092-93 (8th Cir. 2012) (same).

... In the absence of medical opinion evidence, "medical records prepared by the most relevant treating physicians [can] provide affirmative medical evidence supporting the ALJ's residual functional capacity findings." Johnson v. Astrue, 628 F.3d 991, 995 (8th Cir. 2011). ...

See Id. at 932.

Murphree next maintains that adequate consideration was not given to his hypertension. Murphree maintains that he has "regularly seen doctors for his hypertension and has undergone adjustments to his medication and close monitoring of his condition." See Docket Entry 11 at CM/ECF 19.

The ALJ recognized that Murphree had difficulty controlling his hypertension but found that the impairment was not disabling. The ALJ so found for the following reason:

> … Overall, [Murphree] has undergone conservative treatment of his diabetes and hypertension. … By conservative means, [he] has not required any surgery, hospitalization, or other aggressive means to treat his conditions, but instead has only been prescribed medication to manage his symptoms. The record shows that even with very elevated blood glucose levels and blood pressure, [Murphree] has only been prescribed medication to treat the symptoms. Further, the record does not reflect that [his] elevated conditions caused any serious associated problems. As such, conservative treatment is the only treatment that [he] has required, and conservative treatment is inconsistent with allegations of disability.

See Transcript at 22.

Substantial evidence on the record as a whole supports the ALJ's consideration of Murphree's hypertension. There is little evidence that the impairment causes work-related problems. Moreover, the impairment has been treated conservatively. Although Murphree's medication has been changed and adjusted, one of the later treatment records reflects that his blood pressure was "slowing coming down to the target." The extent to which Murphree's hypertension can be controlled is the subject of conflicting evidence. There is evidence that it cannot be controlled; there is also evidence that with diet, exercise, and appropriate medication, his hypertension can come down. Because the evidence is capable of more than one acceptable characterization, the Court is not prepared to find that the ALJ erred in evaluating Murphree's hypertension.

Murphree maintains that adequate consideration was not given to his limited daily activities. It is Murphree's contention that his ability to prepare his own meals, do household chores, shop, help his father with meals and chores, and socialize "do not indicate that Murphree can work full-time, especially at medium work." See Docket Entry 11 at CM/ECF 19-20.

Substantial evidence on the record as a whole supports the ALJ's consideration of Murphree's daily activities. As the ALJ could and did find, Murphree can prepare his own meals, do household chores, shop, help his father with meals and chores, and socialize. Those activities, standing alone, do not establish that he can perform medium work. Had the activities been the only factor the ALJ considered in assessing Murphree's residual functional capacity, the ALJ would have clearly erred. The ALJ, though, also considered other factors in assessing Murphree's residual functional capacity, and there is nothing to suggest that the ALJ gave too much or too little consideration to Murphree's daily activities. In fact, the ALJ credited, to some degree, Murphree's reports concerning his daily activities, noting that his "described activities of daily living do exhibit … disabling conditions that restrict his ability to live." See Transcript at 22. The Court finds that the evidence relevant to Murphree's daily activities is capable of more than one acceptable characterization, and the Court is not prepared to find that the ALJ improperly considered those activities.

Murphree additionally maintains that adequate consideration was not given to his work history. He notes that he worked without interruption from 1968 to 2011, and his uninterrupted work record enhances his credibility regarding his subjective complaints.

Substantial evidence on the record as a whole supports the ALJ's consideration of Murphree's work history. Murphree testified extensively about his work history, work performed primarily as a bar manager for the American Legion. See Transcript at 32-33, 52-56. The ALJ represented that he considered Murphree's work history in assessing his residual functional capacity, see Transcript at 21, and the Court presumes that the ALJ did as he represented. In any event, a claimant's work history is but one factor the ALJ should consider in crafting a claimant's residual functional capacity. It is not clear how a more extensive analysis of Murphree's work history would have led to a different assessment of his residual functional capacity.

The governing standard in this case, i.e., substantial evidence on the record as a whole, allows for the possibility of drawing two inconsistent conclusions. See Culbertson v. Shalala, 30 F.3d 934 (8th Cir. 1994). The ALJ crafted an assessment of Murphree's residual functional capacity that limited him to medium work, and Murphree has not shown why the ALJ erred in doing so. In short, the ALJ could find as he did.

On the basis of the foregoing, the Court finds that there is substantial evidence on the record as a whole to support the ALJ's findings. Murphree's complaint is dismissed, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this 24th day of January, 2018.

_____
UNITED STATES MAGISTRATE JUDGE